IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

**DANIAL WILLIAMS,**

       Petitioner,

v.                                                        Civil Action No. **3:09CV769**

**KAREN D. BROWN,**

       Respondent.

**JOSEPH J. DICK**

       Petitioner,

v.                                                        Civil Action No. **3:10CV505**

**KAREN D. BROWN,**

       Respondent.

## OPINION

This case involves the conviction of four innocent navy men—the "Norfolk Four"—charged with the rape and murder of Michelle Bosko. A fifth man named Omar Ballard actually committed the offense.

Two of the four men, Danial Williams and Joseph J. Dick, have filed the petitions for writs of habeas corpus under consideration here. 28 U.S.C. § 2254. Both pled guilty—Williams to capital murder and rape, and Dick to first degree murder and rape. The trial court accepted their pleas, and they were convicted.

The respondent, on behalf of the Commonwealth of Virginia,[1] has moved to dismiss on two grounds: (1) that the statute of limitations applicable to federal habeas petitions bars the

---

[1] The Court will refer to the respondent as the "Commonwealth," the "prosecution," or the "State" in this opinion.

§ 2254 petitions and (2) that the petitioners' claims are procedurally defaulted. Ordinarily, the Court would dismiss the petitions as untimely and defaulted. The actual innocence of Williams and Dick, however, allows the Court to address the merits of their claims, notwithstanding the technical roadblocks raised by the Commonwealth. *See McQuiggin v. Perkins*, 133 S. Ct. 1924, 1928 (2013) ("[A]ctual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar ... [or] expiration of the statute of limitations."). The Court previously concluded that the petitioners had made a sufficient threshold showing of innocence to warrant an evidentiary hearing on their gateway claim of actual innocence. *See Dick v. Muse*, No. 3:10CV505, 2014 WL 4854689, at *7 (E.D. Va. Sept. 29, 2014); *Williams v. Muse*, No. 3:09CV769, 2014 WL 2921932, at *13–14 (E.D. Va. June 27, 2014).

The Court has conducted the evidentiary hearing. For the reasons set forth below, the Court finds that Williams and Dick are innocent and, therefore, have satisfied the standard for a gateway claim of actual innocence.[2]

## I. How the Murder Really Happened

Before going through a detailed analysis of the evidence in this case, the Court will provide a brief outline of how the crime actually occurred, as conclusively demonstrated by the evidence presented to the Court. A more detailed analysis follows in Part VII of this Memorandum Opinion.

---

[2] The record in this case consists of thousands of pages of notes and transcripts from separate criminal proceedings. In order to narrow the factual issues before the Court, the parties have exhibited commendable professionalism and have filed 1046 Joint Stipulations of Fact ("JSF"). (3:10CV505, ECF No. 109; 3:09CV769, ECF No. 136.) For ease of reading, the Court generally omits the quotation marks in the quotations from the JSF. The Court employs the abbreviation "JA" for citations to the Joint Appendix.

Omar Ballard alone killed Michelle Bosko.  For unknown reasons, Bosko allowed Ballard to enter her apartment late at night, while her husband was not at home.  Ballard somehow got Bosko into the bedroom, where he raped her and stabbed her in the chest a number of times.  Ballard admitted to both the rape and the murder.  In his confessions, Ballard accurately described the apartment, the location of the corpse, and the knife used in the crime.  Scientific evidence supported Ballard's admission.  The police found Ballard's DNA on Bosko.  The fatal stab wounds in her chest were of uniform depth and closely bunched together, indicating that a single individual inflicted them.[3]  The Norfolk Four, in contrast, left no DNA, fingerprints, or other evidence on the scene, could not accurately describe the location of the crime, and did not coherently explain what happened.

This evidence—clear and straightforward—makes it hard for the Commonwealth to tie the Norfolk Four to the crime.  Undeterred, the Commonwealth offers a bizarre explanation for how Williams and Dick committed the alleged offenses.  First, the Commonwealth notes, accurately, that Williams apparently had a crush on Bosko.  (Resp't's Post-Hr'g Br. 16.)  The State contends that Williams and Dick went to her apartment on the night in question.  (*Id.* at 18.)  Then, the Commonwealth says that Williams, Dick, and two other sailors joined Ballard in a united effort to rape and kill Bosko.  (*Id.* at 12.)  The Commonwealth says that the five men banded together to hold her down while she violently struggled.  (*Id.* at 20–21.)  Then they had sexual intercourse with her.  The prosecution says that despite their combined efforts, none of the Norfolk Four ejaculated in Bosko's vagina, and despite their herculean labors to restrain her and her desperate struggles, they left not a trace of DNA.  (*Id.*)  According to the Commonwealth,

_____

[3] The corpse had other, non-fatal stab wounds as well, indicating that Bosko resisted her attacker.

after the sexual assault the four sailors and Ballard took turns stabbing her—passing the knife around so that each had a chance to stab her. (*Id.* at 21.) Yet the men (other than Ballard) did not leave any DNA on Bosko or anywhere else in the apartment. (*Id.* at 22.)

Recognizing the improbability of the scenario it proffers, the State argues that the confessions of Williams and Dick prove that they committed the crime. (*Id.* at 26.) This argument ignores three important things. First, it ignores the physical evidence that demonstrates the sailors' innocence. Second, it ignores how the police secured confessions from the Norfolk Four. The police took multiple statements of the men to groom them to say what the police wanted.[4] Third, this argument ignores dramatic research on how police tactics—such as those used here—lead to false confessions. *E.g.*, Brandon L. Garrett, *Convicting the Innocent*, 14-44 (2011).

In contrast, Ballard described the scene accurately, deposited DNA at the scene, admitted to the offense, and said that the four sailors did not commit the crime. The evidence leads to one sensible conclusion: Ballard alone raped and killed Bosko.

The Commonwealth's theory depends on assumptions that beggar belief: that four men struggled with Bosko without leaving any DNA behind, that four men raped Bosko without leaving any DNA behind, that four men stabbed her without leaving any DNA behind, and that four men passed a knife around, taking turns stabbing her, and creating a neat pattern of fatal wounds, all of the same depth.[5]

---

[4] Unlike Dick, Williams resisted most of the pressure to tell the police the story the police wanted to hear, until the very end.

[5] Although not a rule of evidence or an articulation of a burden of proof, Occam's razor seems particularly applicable to the Commonwealth's theory of the case. Occam's razor teaches that the explanation of an event with the fewest assumptions—the simplest explanation—should

4

Although the Norfolk Four have been released from prison, the wrongful convictions have continuing consequences. For instance, the men have to register as sex offenders. In the case of one of the four—Eric Wilson—the registration prevents Wilson from adopting his stepson, yet Wilson has no remedy in court to undo this injustice. *Wilson v. Flaherty*, 689 F.3d 332, 335 (4th Cir. 2012). Williams and Dick must go through life with the burden of false felony convictions. Regardless of the eventual outcome of this case,[6] it is time for the Commonwealth to free these men of the continuing shackles of their convictions.

## II. Standard for Gateway Claim of Actual Innocence

By any measure, the evidence shows the defendants' innocence—by a preponderance of the evidence, by clear and convincing evidence, by evidence beyond a reasonable doubt, or even by conclusive evidence.

The law actually requires only a substantial showing of evidence. *Schlup v. Delo*, 513 U.S. 298 (1995), articulated the innocence standard for gateway procedural relief. "[A] petition supported by a convincing *Schlup* gateway showing 'raise[s] sufficient doubt about [the petitioner's] guilt to undermine confidence in the result of the trial without the assurance that that trial was untainted by constitutional error'; hence, 'a review of the merits of the constitutional claims' is justified." *House v. Bell*, 547 U.S. 518, 537 (2006) (second and third alterations in original) (quoting *Schlup*, 513 U.S. at 317). A gateway claim requires "new reliable evidence—

---

trump complex explanations that rely on the unlikely confluence of a number of assumed factors. For example, in this case the Commonwealth *could* posit that astronauts landed the space shuttle in Norfolk and committed the crime in space suits, leaving no evidence behind. No one would believe that explanation, but it is scarcely less likely that the scenario offered by the Commonwealth now.

[6] In the next phase of this case, the Court will consider whether errors of a constitutional dimension occurred.

whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324. Here, as detailed in the Court's prior opinions, the petitioners have met the initial burden of producing new, reliable evidence of their innocence. Accordingly, at this stage the Court must consider "'all the evidence,' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial,'" and determine whether the petitioners have met the standard for a gateway claim of innocence. *House*, 547 U.S. at 538 (quoting *Schlup*, 513 U.S. at 327–28).

The Court must determine whether "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 327–28; *Sharpe v. Bell*, 593 F.3d 372, 377 (4th Cir. 2010). This assessment requires the Court to make "a holistic judgment about all the evidence and its likely effect on reasonable jurors applying the reasonable-doubt standard." *House*, 547 U.S. at 539 (citations and internal quotation marks omitted). "It is not the district court's independent judgment as to whether reasonable doubt exists that the standard addresses; rather the standard requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do." *Schlup*, 513 U.S. at 329. As explained below, considering all the evidence, "no juror, acting reasonably, would have voted to find [Williams and Dick] guilty beyond a reasonable doubt." *Id.*[7] Stated more simply, no sane human being could find them guilty.

---

[7] In granting Williams and Dick conditional pardons for their crimes, then Governor Timothy Kaine concluded: "The Petitioner has not conclusively established his innocence and therefore an absolute pardon is not appropriate. However, the Petitioner has raised substantial doubts about his conviction and the propriety of his continued detention." (JA 5219–22; JSF ¶ 29.) Governor Kaine did not have the benefit of all the evidence now before the Court.

### III.  General Timeline of Events Preceding Williams' Guilty Plea

There is no dispute that Ballard raped and murdered Michelle Bosko.  (JSF ¶ 979.)  What the parties dispute is whether Williams and Dick participated in those crimes with Ballard.  A general understanding of the sequence of events before and after the murder is necessary to give context to the evidence in support of Williams' and Dick's guilt or innocence.

#### A.      Events Preceding the Murder of Bosko

In June and July of 1997, Michelle and William Bosko and Danial and Nicole Williams lived in the Bayshore Gardens apartment in Norfolk.  (JSF ¶ 973.)  In late June, Nicole Williams learned that she had ovarian cancer and required surgery.  (JSF ¶ 974.)  Williams arranged to take two weeks of leave to care for Nicole after her surgery.  (JSF ¶ 974.)  Danial and Nicole moved their wedding date forward to June 27, so that Danial's health insurance would cover Nicole's surgery.  (*Id.* ¶¶ 974, 975.)  On July 1, 1997, Nicole Williams entered the hospital for surgery to remove a cancerous tumor.  (*Id.* ¶ 976.)

In June and early July of 1997, Williams would often visit Bosko late at night on the pretense of using Michelle's telephone.  (JA 1739–40, 1743.)  Williams seldom came by to use the phone if Bosko's husband was around.  (JA 1740.)

In the beginning of July of 1997, a couple of days before Bosko's murder and while Nicole Williams was in the hospital, Bosko hosted a party in her apartment.  (JA 1743–44.)  Bosko's  husband, a sailor, was out at sea at the time of the party.  (JA 1744.)  Among others, Tamika Taylor and Omar Ballard went to the party.   (JA 1184–85.)  Williams came to the apartment and asked to use the phone.  (JA 1183, 1746.)  After he got off the phone, Williams

asked to join the party. (JA 1183, 1746.) At about four in the morning, Taylor noticed Williams staring at Bosko's crotch and asked him to leave. (JA 1747–48, 1184, 1186.)

On July 5, 1997, Williams' parents arrived in Norfolk from Michigan to visit him and his new wife. (JSF ¶ 977.) On July 6, 1997, Williams brought Nicole home from the hospital after cancer surgery. (JSF ¶ 978.)

On July 7, 1997, Danial and Nicole visited his parents at their Williamsburg campground for several hours before leaving around dusk with plans to meet for dinner the next day. (JSF ¶ 264.)

On the evening of July 7, 1997, Bosko stayed at Tamika Taylor's apartment from roughly 10:30 p.m. until 11:30 p.m. (JSF ¶ 603.) Eventually, Bosko told Tamika that she wanted "to get everything ready for" her husband's return, and went back to her apartment to do so. (JA 1189, 1760.)

### B.   Investigation Immediately Following Bosko's Murder

On July 8, 1997, shortly before 5:00 p.m., William Bosko returned to his home in Norfolk from a Navy cruise and found his wife murdered in the bedroom of their apartment. (JA 1009–11, 3312.) Bosko banged on Danial and Nicole's door and screamed that his wife was dead and asked them to call 911. (JSF ¶ 268.) Williams then followed Bosko back to the Bosko's apartment where they covered her corpse with a blanket. (JA 1013.)

At 5:45 p.m. Norfolk Investigators Huffman and Graupmann spoke with Tamika Taylor. (JA 3313.) She told the investigators that Williams had been bothering Bosko. (JA 3314.) She stated that Williams "constantly knocks on [Bosko's] door and only when her husband ain't

8

there." (JA 3314.) Based on this information, the police invited Williams to the police department to provide a statement. (JA 3316.)

Williams drove his own car to the police department. (JSF ¶ 341.) Shortly after 8:00 p.m., Detectives Maureen Evans and Scott Halverson took Williams into an interrogation room, at which time they administered the *Miranda*[8] warnings and provided a *Miranda* waiver, which Williams signed two minutes later. (JSF ¶ 342.) Williams agreed to take a polygraph exam, during which he denied killing Bosko. (JSF ¶¶ 349–50.)[9] The "Final Call" in the polygraph report showed "No Deception Indicated." (JSF ¶ 351.) Shortly after midnight on July 8, 1997 (the morning of July 9, 1997), after obtaining the polygraph results, the detectives questioned Williams for two more hours without a break. (JSF ¶ 357.) As an interrogation technique (JSF ¶ 363), Detective Evans told Williams that he had failed the polygraph even though the report indicated he passed. (JSF ¶ 362.)

The detectives took a break from the interrogation from 1:55 a.m. to 2:08 a.m. (JSF ¶ 366.) When the detectives continued with the interrogation, they explained to Williams the current technology of DNA evidence. (JSF ¶ 367.) The detectives discussed with Williams the evidence samples that Williams had consented to give. (JSF ¶ 368.) The detectives took a break from their questioning of Williams from 3:22 a.m. to 3:32 a.m. (JSF ¶ 372.) When the detectives continued the interrogation, they questioned Williams about his obsession with Bosko. (JSF ¶ 373.)

---

[8] *Miranda v. Arizona*, 384 U.S. 435 (1966).

[9] The police interrogated Williams for nearly nine hours before he reversed his repeated denials that he had any involvement in Bosko's death. (JSF ¶ 423.)

9

At 4:33 a.m. on July 9, 1997, Detective Halverson left the interrogation room, and Detective Evans spoke with Williams about having remorse and feeling sorry that Bosko was no longer alive. (JSF ¶ 375.) Williams then began to cry. (JSF ¶ 376.) At 4:51 a.m., Detective Halverson returned to the interrogation room with a new detective, Robert Glenn Ford. (JSF ¶ 377.)

In response to Ford's accusation, Williams denied being in Bosko's apartment the night before. (JSF ¶ 379.) Despite the denial, Ford confronted Williams about being there and having something to do with Bosko's death. (JSF ¶ 380.) Williams then asked for a five-minute break and Detectives Ford and Halverson left the interrogation room at 5:40 a.m. (JSF ¶ 381.) At 5:50 a.m., they returned. (JSF ¶ 382.)

## C.   Williams' First Inculpatory Statements

Williams told the detectives that he had gone alone to Bosko's apartment at approximately 11:30 to 11:45 p.m. on the night of the murder. (JSF ¶ 383.) Williams said that he was wearing white undershorts when he entered the apartment. (JSF ¶ 388.) He said that there was a little struggle when he tried to pin Bosko down, but he did not use weapons or choke her. (JSF ¶¶ 384–85.) At one point he said that he did not remember if he hit Bosko or not, then later said that he hit her a couple of times, but could not remember where. (JSF ¶¶ 386, 397.) Williams said that Bosko hit him a couple of times, but did not have any weapons. (JSF ¶¶ 393–94.)

Eventually he pinned her on the floor. (JSF ¶ 395.) Williams said that he had vaginal sex with her, but did not ejaculate. (JSF ¶¶ 387, 390, 396.) He said that Bosko was hollering and screaming when he left the apartment. (JSF ¶ 392.)

10

### D.   Williams' First Recorded Statement

Between 7:00 and 7:16 a.m., the detectives audiotaped a statement from Williams. (JSF ¶ 398.) Williams stated that he entered the apartment barefoot, and without weapons. (JSF ¶¶ 399, 404.) Bosko was not wearing panties. (JSF ¶ 400.)[10] He did not choke or strangle her, but rather he hit her with his fist and shoe[11] on the side of her head. (JSF ¶¶ 401, 405.) Williams said that he had intercourse with her, but did not ejaculate. (JSF ¶ 402.) Williams said he did not touch the blanket (from which DNA was later recovered) during the assault. (JSF ¶ 403.) At 9:25 a.m., Williams reviewed and signed a transcript of his tape-recorded statement. (JSF ¶ 406.)

### E.   The Evolution of Williams' Second Recorded Statement

At 9:00 a.m. on July 9, 1997, Detective Evans observed Bosko's autopsy. (JSF ¶ 407.) During the autopsy, Evans learned that Bosko had no bruises on her face or head, except bruises on her neck and jaw consistent with being strangled. (JSF ¶ 408.) Detective Evans also learned during the autopsy that Bosko had been stabbed repeatedly in the chest. (JSF ¶ 409.) Three of the stab wounds penetrated deep into her chest, consistent with having been inflicted by the knife found near her body. (JSF ¶ 410.)

Detective Evans called the department with this information. (JSF ¶ 411.) After learning the facts from Evans, Detective Halverson entered the interrogation room and got Williams to sign a transcript of his first tape-recorded statement. (JSF ¶¶ 412, 413.) After Williams signed

---

[10] The crime scene suggested that Bosko's attacker had forcibly removed her underpants. (JA 3689; Joint Ex. 372, at 4.)

[11] During a prior interrogation, Detective Evans had suggested to Williams that he might have hit Bosko with his fist or a shoe in order to silence her. (Joint Ex. 5, at 2.) No physical evidence indicates  Bosko was struck by a fist or a shoe.

11

the transcript, Halverson asked him if he grabbed or held the victim's neck in any way, to which Williams replied that he may have done so while Bosko was screaming. (JSF ¶ 414.)

Detective Evans returned to police headquarters at 11:00 a.m. after the autopsy. (JSF ¶ 415.) She entered the interrogation room and told Williams that Bosko did not die from a beating with a shoe. (JSF ¶ 416.) She asked Williams if he had, instead, stabbed Bosko. (JSF ¶ 417.) Williams denied stabbing Bosko and explained that he could not have stabbed her because he did not have a knife when he went into the house. (JSF ¶ 418.) Evans suggested that the knife may have already been in the room, and pantomimed how and where Bosko had been stabbed. (JSF ¶ 419; Apr. 16, 2015 Tr. 118–19.) Williams then said that he had stabbed Bosko three times in the chest. (JSF ¶ 420.)

At 11:27 a.m., Evans took a second audiotaped statement from Williams, which ended three minutes later. (JSF ¶ 421.) In this second statement, Williams said he stabbed Bosko about three times in the chest to stop her from screaming. (JA 66.) Although prompted, Williams could not provide any description of the knife. (JA 66.) Williams signed a transcript of the second statement at 12:08 p.m. (JSF ¶ 422.)

### F.     DNA Testing Excludes Williams as the Contributor of the DNA Associated with Rape and Murder.

The Commonwealth recovered several biological samples from the crime scene for DNA testing:  a vaginal swab from Bosko, a spermatozoa stain on a white blanket that covered her body, and material from underneath her fingernails. (JA 281.) On December 11, 1997, DNA analysts told Norfolk police that Williams was preliminarily excluded from the crime scene DNA samples. (JSF ¶ 995.) By this time, a grand jury had indicted Williams. (JSF ¶ 989.) The

Commonwealth, however, did not share this information with Williams' lawyers until April 30, 1998.  (JSF ¶ 995.)[12]

### G.      The Police Charge an Ever Widening Group of Individuals in an Effort to Discover the Contributor of the DNA Associated with the Rape and Murder of Bosko.

#### 1. Dick's First Account of the Crimes

On January 12, 1998, Detectives Ford and Brian Wray drove Dick, Danial and Nicole Williams' roommate at the time of the murder, to the Norfolk police department for questioning. (JSF ¶¶ 424–31.)  Dick's questioning began around 10:30 a.m.  (JSF ¶ 430.)  Dick initially told the detectives that he was on board his ship, the *USS Saipan*, on the night of Bosko's murder. (JSF ¶ 432.)  For the next several hours, Dick denied any role in the crimes against Bosko.  (JSF ¶¶ 433–45.)

Around 2:15 p.m., after the detective told Dick that they could prove he was there, Dick provided his first story about his involvement in the crimes.  (JSF ¶ 448.)  Dick said that Bosko let them inside.  (JSF ¶ 449.)  Once inside Williams started making advances toward Bosko, which she did not take well.  (JSF ¶ 449.)  According to Dick, Williams knocked Bosko "down on to the floor, held her down by her shoulders, pulled her pants or her shorts off and then her panties off and started jerking off."  (JSF ¶ 450.)  Dick said that Williams vaginally raped Bosko on the floor and also "began committing oral sodomy to Michelle's vagina."  (JSF ¶ 451.) According to Dick, Williams "forced Michelle to give him a blow job," and placed the blanket under her and raped her again. (JSF ¶¶ 453, 454)

---

[12] In January of 1998, prosecutors offered Williams a life sentence without telling him about the preliminary DNA results that they had recently received.  (JSF ¶ 996.)  Williams declined the offer.  (JSF ¶ 996.)

Dick said that he was "just sitting there watching" and "was not involved in any way other than that he was there." (JSF ¶ 452.)   When he got tired of watching he ran out of the house, leaving Williams in the house, and he did not know what happened after that. (JSF ¶ 455.)

### 2. Dick's Second Account of the Crimes

At 2:45 p.m. Detective Wray left Dick alone in the interview room.  (JSF ¶ 456.)   Around 3:07 p.m., after signing a consent form, Dick provided a blood sample.  (JSF ¶ 458.)   At 3:18 p.m., Detectives Wray and Ford entered the interview room to "clear up some points."  (JSF ¶ 459.)   Dick initially provided the police with an account of the crimes against Bosko similar to that provided above.   (JSF ¶¶ 460–65.)

At 3:27 p.m., Detective Ford told Dick that "when we submit the evidence that was recovered in Michelle" and other evidence from the house, "that it would prove that his penis had been in her at some point" and that he needed to know the "entire truth." (JSF ¶ 466.)  Dick said that once inside they played music and all three of them—Dick, Williams, and Bosko—were sitting on the *living room* floor[13] and that Williams "started rubbing Michelle's breasts and vagina area," but after about five minutes Bosko started resisting.  (JSF ¶¶ 467, 468.)   Williams then pinned her to the floor and asked Dick to hold her shoulders down, which he did.  (JSF ¶ 468.)   While Dick held her shoulders down, Williams "ate her vagina out with his mouth" and asked Dick to do the same thing. (JSF ¶ 469.)  When Detective Ford asked if he "put his penis anywhere," Dick stated that he "stuck his penis in her vagina, also." (JSF ¶ 470.)

---

[13] The evidence shows that the offense occurred in the bedroom, not the living room. (JSF ¶ 826.)

14

Dick kept adding sexual actions to his account. He said that while Williams was "eating the victim's vagina," he "put his penis in the victim's mouth." (JSF ¶ 471.) Bosko tried to bite him, at which point he took his penis out of her mouth, slapped her, and told her that he would slap her harder if she did it again. (JSF ¶ 472.) Dick said that at the time he slapped her, Williams was having vaginal sex with Bosko. (JSF ¶ 473.) Dick said that he ejaculated in Bosko's mouth. (JSF ¶ 474.) Dick said that after he removed his penis from Bosko's mouth he wiped it off on a towel. (JSF ¶ 475.) Later, he changed his story and said he wiped his penis off on a blanket. (JSF ¶ 480.)

Dick said that he had vaginal sex for about five minutes while Williams put his penis in Bosko's mouth. (JSF ¶ 476.) Williams switched places with Dick, put Bosko on a blanket, and had vaginal sex with her again. (JSF ¶¶ 481, 482)

Dick said that the entire ordeal lasted between an hour and an hour and a half. (JSF ¶ 478.) Dick asserted that Bosko fought and resisted the entire time. (JSF ¶ 477.)

According to Dick, he and Williams argued for about five minutes about whether they should stay or not. (JSF ¶ 483.) While they were arguing, Bosko got up and went to the kitchen and picked up a knife. (JSF ¶ 484.) Bosko "went after" Williams with the knife, but Williams grabbed her hand holding the knife. Dick took the knife from her hand and put it down. (JSF ¶ 485.)

Detective Ford told Dick that "he was still not telling us the whole truth" and that "he needed to tell us the entire truth about what he actually did with the knife." (JSF ¶ 486.) Dick then said that when he grabbed the knife from Bosko, he stabbed her twice "but he wasn't sure" and "it could have been more." (JSF 489.) He then dropped the knife. (JSF ¶ 487.) He did not

remember where he stabbed Bosko. (JSF ¶ 488.) Dick said that after he dropped the knife, Williams picked it up. (JSF ¶ 490.) Bosko "came toward him again," so he grabbed her and Williams stabbed her "a couple of more times in the chest while he was holding her." (JSF ¶ 491.) Bosko fell to the ground. (JSF ¶ 492.) Dick said that he put the blanket over her legs and left the apartment, leaving Williams there. (JSF ¶¶ 493, 494.)

At 3:55 p.m., Detectives Wray and Ford left the interview room. (JSF ¶ 495.)

### 3. Dick's Third Account

The detectives were not done with Dick, and Dick was not done with changing his story to meet the detectives' changing expectations.

At 4:37 p.m., Detectives Wray and Ford returned to the interview room "to clear up a few more points." (JSF ¶ 496.) Dick said that the struggle started in the living room and that the rape occurred there. (JSF ¶ 497.) He did not remember what room they ended up in. (JSF ¶ 498.) Detective Ford then asked if "during the struggle they could have ended up in the bedroom[.]" (JSF ¶ 498.) In what was to become a distressingly familiar pattern of accommodating whatever details seemed to make the police happy, Dick stated that "they could have, but he was not sure." (JSF ¶ 498.)

At 4:55 p.m., Detectives Wray and Ford left the interview room, but they returned at 5:17 p.m. to tape record a statement from Dick. (JSF ¶¶ 501, 502.) At 7:00 p.m., Ford reviewed the statement with Dick, who signed it. (JSF ¶¶ 504, 505.) The police then arrested Dick for capital murder and rape. (JSF ¶ 997.)

16

#### 4. Further DNA testing Excludes Dick and Williams as Contributors.

On January 15, 1998, Dick told his parents that he was innocent and had confessed due to police pressure. (JSF ¶ 998.)  On March 26, 1998, a DNA analysis supported his statement to his parents. (JSF ¶ 1004.)  Specifically, the DNA analysis report excluded Williams and Dick from crime scene samples. (JSF ¶ 1004.)  It also excluded Bosko's DNA from Williams' underwear samples.  (JSF ¶ 1004.)

#### 5. The Police Arrest Eric Wilson.

In early April 1998, government informant Timothy Gurley (acting on police direction) got information from Dick about someone named "Eric." (JSF ¶ 1005.)  Eventually, the police focused on Eric Wilson. (JSF ¶ 1005.)  On April 8, 1998, Detectives Ford and Hoggard interrogated Wilson. (JSF ¶¶ 606, 610–22.)  Initially, Wilson denied involvement in the murder (JSF ¶ 623), but he eventually said that he held Bosko down while Williams raped her. (JSF ¶ 643.)  Wilson claimed to have left the apartment when Dick started to rape her while Williams held Bosko down. (JSF ¶ 645.)   He later said he went to Cheetah's Bar and began drinking. (JSF ¶ 651.)

The detectives left Wilson in the interview room for about forty-five minutes. (JSF ¶¶ 647–48.)  When the detectives came back, Wilson said that "they may have ended up in the bedroom when they were all wrestling and playing around." (JSF ¶ 649.)  Wilson could not remember what he was doing when Dick was preparing to rape Bosko. (JSF ¶ 650.)  Wilson said that Williams hit Bosko in the face at least once. (JSF ¶ 652.)

At 5:55 p.m., the detectives confronted Wilson about his participation in the rape. (JSF ¶ 653.)  Wilson said that "he was going to start telling the truth." (JSF ¶ 654.)  According to

17

Wilson's new story, he, Williams, and Dick were in Williams' apartment watching TV when Williams suggested going to Bosko's place. (JSF ¶ 655.) Upon arriving at Bosko's, Williams and Dick sat on the couch with Bosko and started wrestling with her. (JSF ¶ 656.) Wilson said that he joined in the fracas. (JSF ¶ 657.) While Wilson and Dick held Bosko down, Williams hit her once in the face and began to rape her. (JSF ¶ 658.) After Williams finished, Williams and Dick held Bosko down, and Wilson raped her. (JSF ¶ 659.) Wilson penetrated her and thought "that he may have ejaculated in her," but was not sure. (JSF ¶¶ 660, 661.) No one wore a condom. (JSF ¶ 665.)   Wilson said that Williams and Dick "were getting really rough," and after he raped Bosko, he left. (JSF ¶¶ 662, 663.) Wilson said that Bosko was alive when he left. (JSF ¶ 664.)

Wilson then made a taped statement, and signed the transcription of the statement. (JSF ¶¶ 670–72.) The police charged Wilson with capital murder and rape. (JSF ¶ 674.)

### 6. Dick Changes his Story to Incorporate Wilson in the Crimes and Adds an African-American Male to the Cast.

Having gotten a confession from Wilson, the police brought the ever-malleable Dick in to provide some back up. On April 27, 1998, Dick and his attorney, Michael Fasanaro, met with the detectives and Valerie Bowen, an assistant commonwealth's attorney. (JA 176, Joint Ex. 374, at 1) Detective Ford advised Dick that he needed to "tell the truth . . . about anyone else who was involved . . . that he had not previously told us about." (JA 176–77.) Ford also showed Dick some letters that Dick had written to "someone in the jail." (JA 177.)[14]

---

[14] These are the letters Dick wrote to Nicole Williams, which are discussed in the next section.

After privately talking with Fasanaro, Dick provided a whole new account of the rape and murder of Bosko, which now involved Wilson. (JA 177–78.) Dick's new account of the murder was largely inconsistent with the scene of the crime. (JA 179.) For example, Dick now claimed that after stabbing Bosko, Wilson and Williams "had carried the victim's body to the front of the apartment as if they were going to take the body out, and at that time, they heard a car in the parking lot and it scared them, so they took the body to the back room." (JA 179.) No evidence, however, suggested that the body had been moved from the bedroom after the stabbing.

Dick expanded his story to include a group of men who had attempted to get into Bosko's apartment. (Apr. 17, 2015 Tr. 420–21, ECF No. 144.) Bosko rebuffed them, so they went to the parking lot to smoke. At that time, a black man came up and joined their group. (Apr. 17, 2015 Tr. 421.) Dick knew the man from the neighborhood by sight, but did not know his name. (Apr. 17, 2015 Tr. 421.) Fasanaro asked Dick, "Where the hell did that come from?" (Apr. 17, 2015 Tr. 421.)[15] Detective Ford said something to the effect of, "I don't F'ing believe you." (Apr. 17, 2015 Tr. 421.)

### 7. Dick's Bizarre Letters to Nicole Williams

Police informant Timothy Gurley encouraged Dick to write letters from jail to Nicole Williams. (Apr. 16, 2015 Tr. 161–62.) Dick knew Nicole had died in November of 1997. (Apr. 16, 2015 Tr. 161; JSF 992.) Consistent with his willingness to adopt anyone's theory of reality, he inexplicably then believed Gurley's statement that Nicole was alive. (Apr. 16, 2015 Tr. 162.)

---

[15] Ballard eventually wrote a letter admitting his guilt. Fasanaro later showed a picture of Ballard to Dick, who acknowledged that Ballard was the black man he had mentioned in the April 27, 1998 meeting. (Apr. 17, 2015 Tr. 427.)

On April 1, 1998, Dick wrote to Nicole that he loved her and wished he had married her. (Joint Ex. 419, at 2.)  In his next undated letter, Dick told Nicole that Williams and Wilson are the "real murderers," and that he once walked in on Williams and Wilson having sex.  (Joint Ex. 465, at 1.)   In his third letter, (Apr. 16, 2015 Tr. 167), Dick told Nicole that Wilson has been arrested.  (Joint Ex. 420, at 1.)  In a fourth and final letter, Dick told Nicole the story he wanted her to repeat about his, Williams', and Wilson's roles in the rape and murder of Bosko.  (Joint Ex. 418, at 1.)  Dick then wrote:

> Nicole, you know that I love you and I know that you love me.  I'm going to tell you some thing [sic] and I'm being straight up with you.  If my DNA is found to be positive all that happened was Michelle was forced by knife point to give me a blowjob.  I don't want you to get all pissed off at me for this but that is what happen [sic].

(Joint Ex. 418, at 1.)  In short, his letters to the now dead Nicole reflected an alternative universe.

### 8.    Dick Changes His Story to Incorporate Additional Perpetrators, One of Whom He Eventually Identifies as Derek Tice.

Unfortunately for the police, on June 10, 1998, DNA analysis excluded Eric Wilson from crime scene samples.  (JSF ¶ 1008.)  Needing a new suspect, Detectives Ford and Wray went back to Dick for a new version of the events.  (JSF ¶ 1009.)  This time, Dick said that six men took part in the rape and murder.  (JA 189.)  Dick only knew one of the three other suspects, a white man named George, who, Dick thought, had the last name of Clark.  (JA 188.)  Dick had seen "George" at the Banque (a night spot) with Danial.  (JA 190.)

Detective Wray tried to track down George.  His quest led him to a woman who knew Williams.  Although she did not know anyone named George, she did say that at the time of the murder Williams had a friend named Derek Tice.  (JA 197.)  Wray and Ford showed Dick a

20

photograph of Tice, and, ever cooperative, Dick identified Tice as the man he had previously identified as George Clark. (JSF ¶ 1010.)

### 9. Tice Explains the Crime and Implicates Others.

The police charged Tice with capital murder and rape and arrested him in Florida. (JSF ¶ 1011.)   Detective Ford brought Tice back from Florida and interrogated him. (JSF ¶ 1013.)   When asked by Detective Ford if he was there the night of the murder, Tice answered, "No." (JSF ¶ 687), and "denied any involvement."  (JSF ¶ 690.)

Ford persisted in the interrogation.   After about five hours, Tice said that "it was Williams' idea." (JSF ¶ 702.)  Tice said that he, Williams, Wilson, Dick, Geoffrey Farris, and Rick Pauley[16] were all at Williams' house the night of the crime.  (JSF ¶¶ 703, 708.)   At Williams' apartment, the group talked about women they would like to be with, and Williams said that "he would like to have Michelle."  (JSF ¶ 704.)  The entire group then went to Bosko's door. (JSF ¶ 709.)  Tice thought Williams covered the peephole of Bosko's door, but he was not sure.   (JSF ¶ 710.)   One of them knocked, and Bosko asked who was there. (JSF ¶ 711.) Williams answered, "It's Dan, your neighbor, and some friends," at which point Bosko told them to go away.  (JSF ¶ 712.)

Tice said that someone pried open Bosko's door while she resisted. (JSF ¶ 713.) Williams went in first and was the first one "to put his hands on the victim." (JSF ¶ 714.)  Tice was not sure in which room the rape occurred, but he was certain it was not the living room. (JSF ¶ 715.)  To help accomplish the rape, Tice held one of Bosko's legs, Wilson had the other,

---

[16] Pauley and Farris were new additions to the gallery of suspects.  The police charged them both with capital murder and rape.  (JSF ¶¶ 1014, 1015.)  Forensic analysis eventually excluded them as sources of DNA at the crime scene.  (JSF ¶ 1016.)

and Dick and Pauley held her arms.  (JSF ¶¶ 718, 721.)  Bosko tried to scream, but someone, possibly Farris, held her mouth.  (JSF ¶¶ 717, 720.)  All the men were "grabbing on" Bosko, and Tice did not know who removed her clothing.  (JSF ¶ 719.)  Tice said Williams raped her first, followed by Tice, and, in some order, Pauley, Dick, and Farris.  (JSF ¶¶ 723–25.)  When Detectives Wray and Ford asked Tice if anyone was scratched, Tice said that she might have scratched Farris.  (JSF ¶ 743.)  Tice thought that Farris tried to make the victim perform oral sex, but she did not.  (JSF ¶ 744.)  Bosko resisted and struggled the entire time.  (JSF ¶ 726.)

According to Tice, after the rape Williams held Bosko's mouth to keep her from screaming.  (JSF ¶ 727.)  When Tice got up to leave, Tice heard a slap, possibly administered by Williams. (JSF ¶¶ 728, 729.)  Everyone except Williams got up to leave, but Wilson, Dick, and Farris went back into the room with Williams.  (JSF ¶ 730.)

Detective Ford told Tice that he failed the polygraph test because he knew how Bosko was killed.  (JSF ¶ 731.)  Tice then said that although he started to leave, he went back and told Danial, "Just stab the bitch."  (JSF ¶¶ 732, 733.)  Farris went to the kitchen to get a knife.  (JSF ¶ 740.)  They held her upright, and somebody held her from behind, while they each took turns stabbing her."  (JSF ¶ 742.)  Farris stabbed her first, followed by Williams, Dick, Tice, Wilson, and Pauley.  (JSF ¶¶ 734-39.)  According to Tice, they moved the body after the stabbing because she had fallen onto  Farris's foot.  (JSF ¶ 741.)

At 8:55 p.m., Detectives Wray and Ford left the interview room.  (JSF ¶ 745.)  At 10:15 p.m., Detectives Wray and Ford returned to the interview room and told Tice that they "needed to go back through the story."  (JSF ¶ 746.)  Tice then went back through the story with some slight modifications.  (JSF ¶¶ 747–68.)

22

In later statements, Tice added still more characters to the cast of the crime. On October 27, 1998, Detective Ford interrogated Tice again. Tice named John Danser as a seventh suspect. (JSF ¶ 1017.) The police arrested Danser and charged him with rape and murder. (JSF ¶ 1018.) In his interrogation, Danser did not confess. (JSF ¶ 1018.) On November 4, 1998, Ford obtained motel records corroborating Danser's assertion that he was not in Norfolk until well after the murder. (JSF ¶ 1019.)

On November 5, 1998, Tice also implicated an African-American male, but ten minutes later retracted his accusation. (JA 273.) Tice said that the "seventh guy" was a black male, 5'9" to 5'10", with a muscular build. (JA 273.) According to Tice, the new person was a friend of Danial and none of the others. (JA 273.) Tice said he did not previously mention the African-American male because he was afraid of him. (JA 273.) Tice then retracted this statement and he said he did not know anything about the crime because he was not there. (JA 274.)

Notwithstanding his allegedly active role in the rape and murder, DNA analysis excluded Tice as a source of the DNA on the crime scene. (JSF ¶ 1023.)

### IV. Williams' Guilty Plea

As noted above, Williams pleaded guilty to the offenses. Before his plea, Williams believed that both Tice and Dick were going to testify against him. (Apr. 16, 2015 Tr. 123.) Williams' lawyers told him that he had "no chance" of prevailing at trial and that after he was found guilty he would "most likely get the death penalty." (Apr. 16, 2015 Tr. 123–24.)

On January 22, 1999, Williams pleaded guilty to rape and murder in exchange for not being subject to the death penalty. (JSF ¶ 1021.) At his guilty plea hearing, Williams confirmed that seven people were involved in the attack, that he had strong sexual desires for Bosko, that he

23

and the others planned the assault, that they jointly decided to kill her, and that they each took turns stabbing her.  (JA 497–99.)

### V. Events Immediately Following Williams' Guilty Plea and the Discovery of Ballard as the Contributor of the DNA from the Crime Scene

On February 9, 1999, the police again questioned Williams.  (JSF ¶ 1022.)  Detective Wray's notes reflect that "Williams would not give anymore [sic] details of the murder and appeared to be real evasive about the facts of the case and appeared to be telling these investigators just what was on the agreed stipulation that he had signed during his guilty plea." (JA 278.)

On February 18, 1999, a more sensitive DNA analysis confirmed that Williams, Dick, Tice, Wilson, Farris, Pauley, and Danser had not contributed any crime scene DNA samples, including DNA collected by vaginal swab.  (JSF ¶ 1023.)

On February 22, 1999, the police received a letter in which Ballard confessed to a friend that he murdered Bosko.  (JSF ¶ 1024.)  On March 4, 1999, a DNA analysis report reflected that Ballard's DNA was consistent with the DNA found on a blanket at the crime scene.  (JSF ¶ 1026.)  That same day, Ballard told Ford he committed the murder alone.  (JSF ¶ 1027.)

Before Williams' sentencing, prosecutors gave Williams' lawyers Ballard's confessional letter and the DNA report inculpating Ballard.  (JSF ¶ 1028.)  Williams immediately requested that his attorneys withdraw his guilty plea.  (JSF ¶ 1028.)  On April 28, 1999, the Norfolk Circuit Court denied Williams' motion to withdraw his guilty plea and sentenced him to life in prison without the possibility of parole.  (JSF ¶¶ 1031,1032.)

24

## VI. Ballard's Statements

### A.     Ballard's First Statement

On March 4, 1999, Detectives Ford and Peterson interviewed Ballard at Augusta Correctional Center. (JSF ¶ 882.) After waiving his Miranda rights, Ballard told them that he went to Bosko's apartment between approximately 12:00 to 1:00 a.m. (JSF ¶¶ 885, 887.) He and Bosko had consensual sex on the bed and possibly the floor. (JSF ¶¶ 888, 890.) Detective Ford told Ballard they could prove rape. (JSF ¶ 891.) Ballard said that he was not worried about a capital murder charge because he took money from the apartment and therefore it was already a capital murder charge based on the robbery. (JSF ¶ 892.) Ballard said that he took thirty-five dollars off of the table near the kitchen after he killed Bosko. (JSF ¶ 893.)

Ballard said that he was drunk and high the night that he murdered Bosko. (JSF ¶ 894.) Ballard admitted killing her, but initially did not remember how. (JSF ¶ 889.) Ballard said that "he did it by himself." (JSF ¶ 895.) Ballard denied punching her, but said that he stabbed her three or four times in the chest with a knife from the kitchen drawer. (JSF ¶¶ 896, 897) He described the knife as four to five inches long with a brown handle with ridges. (JSF ¶ 899.) Ballard said that he stabbed Bosko in the chest when she was standing up. (JSF ¶¶ 896, 900.)

Ballard left the apartment between 2:30 and 3:00 a.m. (JSF ¶ 914.) As he left, he heard Bosko moaning. (JSF ¶ 901.) He could not remember if the apartment was locked after he left. (JSF ¶ 902.) After leaving, Ballard went to Tamika Taylor's house. (JSF ¶ 903.)

Ballard told Detectives Ford and Peterson that the other men charged with the rape and murder were not with him when he committed the crime. (JSF ¶¶ 908, 909.) In fact, Ballard said that he had never even talked with Williams. (JSF ¶ 912.)

25

### B.    Ballard's March 11, 1999 Statement

On March 11, 1999, Ballard gave a second statement.  (JSF ¶¶ 915, 916.)  Ballard admitted that he raped Bosko in the bed before murdering her.  (JSF ¶ 917.)  As he was leaving, she asked "Why did you do it?"  (JSF ¶ 918.)  At that point, he "snapped," grabbed her, and began choking her with both hands on the floor.  (JSF ¶¶ 918–20.)  After choking Bosko, he got a knife from the kitchen and stabbed her three to four times.  (JSF ¶ 921.)  When she fell to the ground, he climbed on top of her and stabbed her two or three more times.  (JSF ¶ 922.)  Ballard said that he was in the house for about five minutes.  (JSF ¶ 923.)

Ballard confirmed that he acted alone.  (JSF ¶ 924.)  Ballard again said that he had never even talked with Williams.  (JSF ¶ 925.)  He again denied that anyone else had taken part in the rape and murder of Bosko.  (JSF ¶ 927.)

### C.    Ballard's March 15, 2000 Statement

On March 15, Ballard gave another statement to Detectives Ford and Peterson.  Before giving the statement, however, Ballard met alone with Ford.  After meeting Ford, Ballard gave a version of his story consistent with the police theory of the case.  He implicated Williams, Dick, Wilson, and Tice.  Ford's notes say that Ballard indicated that the men told him they had been unable to get into Bosko's apartment.  Ballard then knocked on her door, Bosko opened it, and they all rushed in and raped and stabbed the victim.  (JA 320).[17]  According to Ford's notes, Ballard said he had not told the story before because he was a member of the Five Percenters and

---

[17] Detective Peterson does not remember if he was in the interview room when Ballard said that other men were involved in the rape and murder of Bosko.  (JSF ¶ 931.)  Detective Ford's notes do not indicate that anyone else was present when Ballard made that statement.  (JA 320.)

did not want anyone to know he had been involved in a crime with white people. (JA 320, JSF ¶ 932.)

At a hearing on Tice's state habeas petition, Ballard testified that he implicated Williams, Dick, Tice, and Wilson to accommodate Detective Ford and avoid the death penalty.   Ballard stated:

> Well, I was brought into a little interrogation room where I was informed that in order for me to get a plea agreement or have it accepted, I will have to tell the truth. That's supposed to have been a condition of my plea agreement.
>
> So Detective Ford at the time asked me what the truth was. So I told him the truth was what I was saying all along, that I did it all alone. Nobody else was with me. And then he laughed and told me I'd never be able to receive my plea agreement if I keep on lying.
>
> After which he ran a story down to me about me supposedly meeting the other defendants in the parking lot at a party at the complex that Michelle lived at asking for a cigarette. And then I supposed to have led them to her apartment where we supposedly took turns raping and killing.

(JA 3480–81.) Ballard was then asked what he meant by saying that Ford "ran down a story." (JA 3481.)  Ballard explained that Ford "basically told me a version of the story that I never heard of before. . . .  That I supposed to be meeting these guys at a party at the complex Michelle lives at, and I led them to her apartment." (JA 3481.) Detective Ford made it clear that "the only way I could escape the death penalty was to reiterate what he was telling me, which was me meeting the guys at the parking lot." (JA 3482.)

Ballard also testified at the Tice habeas hearing that he had consensual sex with Bosko before killing her. (JA 3501–3502, 3504; JSF ¶ 934.) Additionally, Ballard confirmed that he alone raped and murdered Bosko. (JSF ¶ 936.)

27

## VI. Timeline of Other Relevant Events

On April 21, 1999, Dick pled guilty to rape and first-degree murder. (JA 574–75). He did so in exchange for not being subject to the death penalty. (JSF ¶ 1030.)

On May 14, 1999, the prosecution dropped all charges against Pauley, Farris, and Danser. (JSF ¶ 1034.)

In June 1999, Eric Wilson was tried and found guilty of rape. (JSF ¶ 1035.) Dick testified against Wilson at the trial. (JSF ¶ 1035.) Ballard was called as a witness, but refused to testify. (JSF ¶ 1035.)

In February 2000, Tice was tried and convicted of rape and murder. (JSF ¶ 1036.) Dick testified against Tice. (JSF ¶ 1036.) Ballard testified that Tice was not involved. (JSF ¶ 1036.) The convictions were later overturned on appeal. (JSF ¶ 1036.) In 2003, Tice was retried, Dick again testified against Tice, and Tice was again convicted. (JSF ¶ 1038.)

On March 22, 2000, Ballard pled guilty to the rape and murder of Bosko. (JSF ¶ 1037.)

Williams, Dick, Tice, and Wilson filed a petition for absolute pardon the Governor of Virginia. (JSF ¶ 1039.) On August 6, 2009, Governor Timothy Kaine granted conditional pardons to Williams, Dick, and Tice. (JSF ¶ 1041.) The Commonwealth released them from prison, but their convictions remain in place. (JSF ¶ 1041.) They must register as sex offenders in their home states. (JSF ¶ 1041.) Williams, Dick, and Tice are on parole for twenty years. (JSF ¶ 1041.) Governor Kaine denied Wilson's clemency request because Wilson had already served his sentence. (JSF ¶ 1041.)

28

On September 14, 2009, this Court granted Tice's petition for a writ of habeas corpus on a claim of ineffective assistance of counsel. (JSF ¶ 1042.) The Commonwealth did not retry Tice.

On February 25, 2011, this Court sentenced Detective Ford to 150 months of imprisonment for convictions for extortion, conspiracy to commit extortion, and making false statements. (JSF ¶ 1045); *United States v. Ford*, 470 F. App'x 146, 146 (4th Cir. 2012).

### VII. Evaluation of the Evidence

Strong, credible evidence shows the innocence of Williams and Dick. The multiple conflicting statements by the sundry cast of alleged participants in the rape and murder simply do not hold water, and cannot withstand any level of examination.

### A.    The DNA Evidence Indicates a Single Individual Attacked Bosko.

At various times, the Commonwealth has contended that Williams, Dick, Wilson, Tice, Pauley, Farris, Danser, and Ballard wrestled a struggling Michelle Bosko to submission, raped her, passed around a knife, and stabbed her. The physical evidence puts the lie to all these stories.

The police did not recover DNA linked to the crime from any of these people except Ballard. (JSF ¶ 48.) DNA testing of the sperm and non-sperm fractions on the blanket and the semen on the vaginal swab support the conclusion that only Ballard raped Mrs. Bosko. Additionally, the presence of only Ballard's DNA under Bosko's fingernail supports the conclusion that only Ballard struggled with her. Even the Commonwealth concedes that "[t]he DNA evidence is consistent with the scenario of Ballard being the lone assailant." (JSF ¶ 320.)

29

A reasonable juror could not reconcile the utter lack of DNA from any suspect other than Ballard with the theory of a gang-rape that involved Williams and Dick.[18]

## B.    Expert Analysis of the Scientific Evidence Indicates that a Single Person Attacked Bosko.

In the current proceedings, Dr. Werner U. Spitz, a highly respected, board certified forensic pathologist, testified about the forensic evidence.   Dr. Spitz had no reservation in concluding that Bosko's injuries show that a single assailant attacked her.   Dr. Spitz observed:

> The three, closely clustered, deep stab wounds to the left chest area are of the same depth and following the same trajectory.  A single offender, while holding Ms. Bosko down, could inflict such wounds.  But it would be nearly impossible for a group of men, passing a knife around, to mirror the path and depth of the stab wound of his co-assailant.  The neck injuries also strongly point in the direction of one assailant.  They are not severe; there would be more bruising had more than one assailant participated in strangling Ms. Bosko.  The same can be said of the genital injuries.  There is no doubt the injuries were caused by forceful penetration.  But if Ms. Bosko was subjected to a gang rape, as the prosecution's evidence claimed, there would be significantly more injury here.
>
> Additionally, the absence of defensive or scrimmage injuries to the arms and legs is equally significant.  I would not expect to see such injuries in a single assailant crime.  But in the custodial statements by Dick, Wilson and Tice, there is repeated reference to Ms. Bosko being carried by her limbs and restrained during the assault.   There would be defensive or scrimmage injuries under those circumstances, and the absence of such injury, points, as does the other evidence, away from a multiple offender crime.

(Spitz Expert Report 5–6, ECF No. 117–2)

In addition, Dr. Spitz could not square the blood patterns around Bosko's body with the theory that she was stabbed by a series of men. Dr. Spitz correctly observed that the photographs of the victim at the crime scene

---

[18] In an understatement, this Court previously observed that "significant questions [exist] as to how the medical evidence squared with the prosecution's theory that seven or eight men had taken turns stabbing Michelle." *Tice v. Johnson*, No. 3:08CV69, 2009 WL 2947380, at *19 (E.D. Va. Sept. 14, 2009) (footnote omitted).

show Ms. Bosko on the floor in her small bedroom, her head turned somewhat to the left and blood from the nose on both sides of her face. Blood splatter on the floor is seen on photographs in a semicircle to the left side of her body. There is no smearing of blood noted anywhere.

(*Id.* at 3.) He said that the un-smudged blood pattern around the body is consistent with a single offender. (*Id.* at 6.) "Multiple offenders would have tracked up the scene and would have left markings such as footprints and other evidence at the scene and in the blood." (*Id.*) Dr. Spitz concludes:

> After evaluating all of the evidence, it is my opinion that the injuries on Ms. Bosko's neck, left side of her chest, and genital injuries are all consistent with a single offender and inconsistent with multiple offenders. From a forensic pathology perspective, the entire record in this matter is wholly inconsistent with a conclusion that multiple offenders raped and murdered Ms. Bosko.

(*Id.* at 6.)

An expert called by the Commonwealth does not dispute Dr. Spitz's analysis. At Tice's second trial in January of 2003, Dr. Kinnison testified for the prosecution. The Court in Tice's habeas case then noted:

> Dr. Kinnison acknowledged that the three fatal wounds to the chest cavity were closely grouped, entered in the same general direction and were "virtually identical" in depth. (Jan. 28, 2003 Tr. 36.) Dr. Kinnison further acknowledged that "the strangulation and the stab wounds could have been caused by one individual." (Jan. 28, 2003 Tr. 39.) Throughout her testimony, Dr. Kinnison was reluctant to offer an opinion as to whether the medical evidence was more consistent with an attack by a single individual rather than by multiple individuals. Nevertheless, she acknowledged that, on July 9, 1997, when she conducted Michelle's autopsy, consistent with the then prevailing police theory, her impression was that the crime was committed by a single individual.

*Tice v. Johnson*, No. 3:08CV69. 2009 WL 2947380, at *19 (E.D. Va. Sept. 14, 2009). In short, her testimony is, at best, equivocal.

The scientific evidence destroys the Commonwealth's theory that a group of men committed the rape and murder. Coupled with the positive DNA identification of Ballard, the scientific proof leads inevitably to the conclusion that Ballard alone committed the crime.

### C.   Analysis of the Crime Scene Also Belies the Notion that Three or More People Committed the Crimes Against Bosko.

The non-scientific evidence leads to the same conclusion. Gregg McCrary, a retired FBI special agent with forty years of investigations and crime scene analysis, found the crime scene evidence entirely inconsistent with the multiple assailant theory. (*See* McCrary Report 11–12, ECF No. 117-1.) The crime scene photographs show a small, seven hundred foot apartment. (*Id.*) It was generally neat and tidy, with no evidence of forced entry. The intruder left the living room largely undisturbed, including a table directly in the path of the opening of the front door. (*Id.*) Of the four chairs for the dining room table, only two were pulled away from the table. (*Id.* at 7.) Someone, presumably the perpetrator, had dumped the contents of Bosko's purse onto the dining room table. (*Id.* at 10.)

A narrow hallway—34 inches wide—led to the bedroom where the rape and murder occurred. (*Id.* at 7.) A police video shows precariously balanced papers and other items on shelves along one side of that hallway. (*Id.* at 7–8.) McCrary observed that it is "just not plausible" for multiple offenders to have restrained a struggling victim and forced her down the hallway without disturbing any of the papers. (Apr. 16, 2015 Tr. 30, ECF No. 141.)

The bedroom where the rape occurred is another cramped room, and its condition reinforces the conclusion that multiple offenders did not commit the crime. In the bedroom, numerous small items rest undisturbed on a dresser a few feet from Bosko's body. (Joint Ex.

32

197.) Additionally, adjacent to the dresser a mirror is balanced against the wall. (Joint Ex. 198.)

As McCrary observed,

> it would be very unlikely [that the mirror] and the items on the dresser would be completely undisturbed if we had this sort of chaotic scene with multiple offenders moving around holding her down. She is struggling. They are fighting, they are raping her, they are stabbing her. [One] would expect the scene to show more of that disarray.

(Apr. 16, 2015 Tr. 31–32.)   McCrary also underscored Dr. Spitz's comments about the location

of blood stains in the apartment. He noted that:

> Given the undisturbed, well-defined blood droplets around the victim and the absence of any blood smearing that would have occurred if multiple offenders had been moving around the body and assaulting the victim, it is highly likely that Ms. Bosko was raped and stabbed by one person.  One would also reasonably expect to find footwear impressions and possible palm or fingerprints or smearing of those impressions on the polished floor in the bedroom or elsewhere if multiple offenders were struggling to carry her as she resisted or were holding her down and taking turns moving around her taking turns raping and stabbing her.

(McCrary Report 11.)

At the evidentiary hearing, McCrary further clarified how the blood droplet evidence

tended to show that a single perpetrator—rather than multiple perpetrators—had committed the

crime. McCrary noted that after a stabbing in the lungs, blood would get into the victim's lungs'

air sacs and she would exhale the blood, creating blood droplets. (Apr. 16, 2015 Tr. 38.) Blood

also would come out of the knife wounds and probably created the pooling under the victim's

left arm. (Apr. 16, 2015 Tr. 38.)

> The significance is that it is undisturbed.  We can see the [blood] droplets well defined on the [victim's] arm.  Around the arm there is a little pool of blood under the left arm as well.  None of that has been disturbed or smeared in any way.

Again, if we go with the theory we had multiple offenders moving around the body, handing the knife off, stabbing . . . , holding her down, I mean that arm has not moved at all. . . .

So that is inconsistent with the theory of multiple offenders. We would see blood smearing . . . , but the fact that we don't have any blood smearing, again, would be consistent with a lone offender inflicting multiple wounds and then leaving the area.

(Apr. 16, 2015 Tr. 37–38.)   A reasonable juror would have difficultly squaring the evidence of the crime scene with the theory that three or more individuals raped and murdered Bosko.

### D.   A Crime Scene Reconstruction Expert Offered a Persuasive Theory Consistent with Ballard's Sole Guilt.

Ballard's initial candid admission, that he committed the crimes alone, aligns with the physical evidence.   Larry McCann, an expert in crime scene reconstruction, provided a compelling description of how Ballard's rape and murder of Bosko likely happened. (JA 3688–89.)   Ballard went by Bosko's apartment after 11:30 p.m., and she let him in because she knew him.   (JA 3688.)   Ballard and Bosko were in the kitchen, where she was preparing to cook an egg.[19] (JA 3688.)   Ballard's unwelcome advances caused her to flee to the bedroom. (JA 3688.) Ballard followed with a knife from the kitchen drawer. (JA 3688.)   Ballard then forced Bosko to the floor of the bedroom where he controlled her with the knife[20] while he raped her. (JA 3688–

---

[19] Bosko kept a generally clean apartment. Yet, an egg was found on the kitchen floor and a frying pan was found on the stove. (JA 3690.) McCann thinks Bosko dropped the egg when Ballard began to act offensively. (JA 3688.)

[20] As noted by Dr. Spitz, in addition to the three fatal stabbing wounds,

> Ms. Bosko also suffered four or five superficial wounds that did not penetrate the upper layer of skin, referred to herein as "jab wounds." These jab wounds were made by a pointed object, most likely the same instrument because they were clustered in the exact same location. The location of these stab and jab wounds centered over a total area of 2¾ inches by 2 inches are all located inward of the left breast.

(Spitz Report 4.)

34

89.)  After raping her, he stabbed her several times.  (JA 3689.)  Ballard then wiped his penis on a nearby blanket and went to the dining room.  (JA 3689.)  Ballard dumped the contents of Bosko's purse on the table and sat down at the table.  (JA 3689.)  Ballard took the cash that had been in the purse and left the apartment.  (JA 3689.)

McCann's scenario fits the physical evidence much better than the tales that implicate Williams, Dick, and a host of others.

### E.    Factors that Lend Credibility to Williams' Alibi

Although he confessed and pleaded guilty, Williams says that he did not commit the crime and, in fact, was at home in bed at the time of the murder.  Recantations are "properly viewed with great suspicion," *Dobbert v. Wainwright*, 468 U.S. 1231, 1233 (1984), and are generally "received skeptically."  *Thompson v. Garrison*, 516 F.2d 986, 988 (4th Cir. 1975) (citation omitted).  Nevertheless, given the ample corroboration, a juror considering Williams' current testimony would find that testimony credible.    Specifically, Williams' alibi is corroborated by the polygraph test he took during his initial interrogation, commonsense, Nicole's statements to the police, and Williams' repeated denial of his involvement to his attorney.

### 1.  Williams' Assertion that He Was Home in Bed at the Time of the Crimes Is Facially More Plausible than His Inculpatory Statements.

Numerous facts in Williams' initial inculpatory statements to the police fail to square with the physical evidence.  (*See* JA 3699–3700.)  It appears from the record, including the audio recording of Williams' statements, that as Williams became more tired, he became increasingly susceptible to changing his story to accommodate the suggestions of his interrogators and provide a version of events that coincided with the crime scene.  Moreover, as discussed above,

35

the physical evidence fails to indicate that Williams was in Bosko's apartment at the time of the crimes.  Furthermore, a juror would find it challenging to believe that after spending the day with his parents and putting his sick wife to bed at 8:30 p.m., six of Williams' buddies materialized at Williams' apartment, and then went next door to rape and murder Bosko with Ballard.  Indeed, as explained below, Nicole Williams said that did not happen.

In addition, on the first day of his interrogation, Williams passed a polygraph indicating that he did not lie when he denied taking part in the crime.  (JSF ¶¶ 348–51.)  The police deceived him about the polygraph report in an attempt to manipulate him into a confession. Their deception proved successful—until someone looked at all the facts in the case.

### 2. Nicole Williams Said Williams Was in Bed with Her at the Time of the Crimes.

When first questioned by the police, Williams said he was home in bed with Nicole at the time of the murder.  (JA 20.)  Nicole confirmed this account and specifically told the police that he was with her on the night of July 7, 1997, until the morning of July 8, 1997.  (JSF ¶ 9.) Nicole provided this corroboration for her husband's whereabouts before she had any reason to think the police considered her husband a suspect.

Although Nicole was admittedly a sound sleeper and was taking medication at the time, she said "that several times during [the night of the murder], she had woken up, and . . . the first time she woke up was approximately 11:30 p.m."  (Joint Ex. 372, at 14.)  Nicole's statements belie the prosecution theory that Williams snuck out of bed to party with his friends and rape the woman across the hall.

36

### 3. Williams Has Consistently Professed his Innocence.

A reasonable juror would likely believe Williams' profession of innocence because he has consistently maintained his innocence. The Norfolk Circuit Court appointed Danny Shipley and Robert Frank to defend Williams on his criminal charges. (JSF ¶ 140.) During the entire time that they represented him, Williams always claimed innocence. (JSF ¶¶ 153–54.) He never said he knew anything about the crime, or that he could implicate anyone else. During his first substantive discussion with his attorneys, Williams told them he was innocent and had been in bed with his wife the night of the murder.[21] (JSF ¶¶ 158, 162.) Williams told his lawyers that the only reason he told the police that he raped and murdered Bosko was because of a lengthy and high-pressure interrogation that started around 8:00 p.m. on July 8, 1997 and did not finally end until after 11:00 a.m. the next morning, July 9, 1997. (JSF ¶ 164.) Williams told his lawyers that he eventually relented in the face of Detective Ford's pressure to confess, and told the police what they wanted to hear. (JSF ¶ 183.)

Williams maintained his innocence even when admitting guilt would have helped him. For example, shortly after learning about Dick's arrest, Shipley asked Williams why he had not told him that there was another person involved in this crime, because they could have used that information to offer cooperation to the prosecution in order to avoid the death penalty. (JSF ¶¶ 197–99.) Williams responded, "[H]ow could I tell you his name, I wasn't there?" (JSF ¶ 200.)

---

[21] Before Nicole Williams died, she told Danial's lawyer that she knew that her husband was home in bed with her on the night that Bosko died. (JSF ¶ 191.)

A couple months after Dick's indictment, Williams' lawyers learned through media reports that Wilson had confessed to participating in the crime. (JSF ¶ 205.) Shipley again asked Williams why he had withheld information that could have helped in plea negotiations. (JSF ¶ 206.) Once again, Williams responded, "[H]ow could I tell you about Wilson? I wasn't there." (JSF ¶ 207.)

Despite intense pressure from his attorneys, Williams repeatedly turned down offers to plead guilty in exchange for the Commonwealth agreeing not to seek the death penalty. (JSF ¶¶ 202, 211.)[22]  Even after agreeing to plead guilty, Williams continued to insist to his lawyers that he was innocent.   (JSF ¶ 229.)

### F.    Additional Reasons Williams' Admissions Appear False

Detective Ford has a proven history of eliciting false confessions; he had previously been demoted for securing a series of false confessions. (JSF ¶ 972.) He also has a proven history of manipulating the criminal justice system for financial gain.[23]  These facts raise legitimate questions about whether Ford shaped the investigation to avoid professional censure for securing another false confession.  Ballard's testimony that Ford fed him a story that implicated Williams, Tice, Dick, and Wilson falls squarely in line with Ford's conduct outside the Norfolk Four cases.

---

[22] Williams' persistence in refusing to plead guilty despite the mounting evidence against him caused counsel to pursue a competency evaluation of Williams. (JSF ¶ 111.)  Williams also insisted to the clinical psychologist who conducted the evaluation that he was innocent. (JSF ¶¶ 136, 137.)

[23] "On October 27, 2010, Detective Ford was found guilty by a federal jury of two counts of extortion and a single count of lying to the FBI, stemming in part from his acceptance of tens of thousands of dollars from accused criminals in return for leniency in bail terms and in sentencing." *Tice v. Johnson*  647 F.3d 87, 96 n.2 (4th Cir.  2011) (citation omitted).

Moreover, Williams' sworn admission of guilt is demonstrably false in several respects relating to his alleged accomplices. First, his admission fails to mention Ballard's involvement in the rape and murder. Second, that admission falsely states that John Danser and Rick Pauley participated in the rape and murder. John Danser was 290 miles away from the scene of the crime in Warminster, Pennsylvania, at the time of the crime. (Joint Ex. 431 at 49–67). Work records and ATM records confirm Danser's presence in Warminster. (JSF ¶¶ 93–103.) Rick Pauley was at home with his parents on the night of July 7, 1997. (Joint Ex. 431, at 89–92.) Pauley's mother testified that her son Rick was home communicating on the phone with his then-girlfriend, who lived in Australia, late on the night of July 7, 1997, and into the early morning hours of July 8, 1997. (*Id.*) Telephone records corroborated this testimony and Rick Pauley's alibi. (Joint Ex. 257.) All of this evidence would cause a juror to doubt the veracity of the notion that Williams raped and murdered Bosko with a host of other men.

## G.    Dick's Current Recantation and Prior Admissions of Guilt

Dick now swears that he "had no involvement in the rape and murder of Ms. Moore–Bosko. . . . In addition, any statements I made implicating Danial Williams, Derek Tice, or Eric Wilson in the Ms. Moore–Bosko's rape and murder are completely false." Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254, Declaration of Joseph Jesse Dick, Jr. ¶ 41, Dick v. Muse, 3:10CV505, ECF No. 1–3 (E.D. Va. filed July 23, 2010).

### 1. Dick's Admissions of Guilt Are Inconsistent with the Physical Evidence.

Dick's admissions of guilt suffer the same central problem as Williams': the physical evidence contradicts them. As discussed above, the "multiple perpetrator" theory cannot hold water; Dick's many admissions all incorporate some version of this theory. The DNA evidence

contradicts Dick's statements.  The physical evidence on the scene contradicts Dick's statements.  Ballard's confession contradicts Dick's statements.

Without going through all the evidence again, suffice to say that Dick's admissions cannot withstand any rational scrutiny.

### 2. Dick's Alibi

Dick now has an alibi that his attorney was not able to develop prior to Dick's guilty plea.

#### (a) Michael Ziegler's Testimony

In July of 1997, Dick was assigned to the *USS Saipan*.  (April 17, 2015 Tr. 368–69, ECF No. 144.)  At that time, Michael Ziegler served as his immediate supervisor.  (Apr. 17, 2015 Tr. 370.)  Ziegler required Dick to live on the ship, but he could leave when off duty.  (Apr. 17, 2015 Tr. 375–77.)  The sailors worked eight-plus hours on Monday through Friday, and every fourth day were "on duty," with twenty-four hours of responsibility.  (Apr. 17, 2015 Tr. 369, 373–74.)  A sailor on duty must remain on the ship the entire time when he is on duty.  (Apr. 17, 2015 Tr. 374.)

Ziegler testified that Dick was on duty on Monday, July 7, 1997.  (Apr. 17, 2015 Tr. 378.)  Thus, Ziegler concluded, Dick would have remained on duty from 7:30 a.m. July 7, 1997 until 7:30 a.m. July 8, 1997.  (Apr. 17, 2015 Tr. 378.)  Ziegler explained that every working day, all the sailors had to attend a roll call and confirm with central command that all sailors were present and accounted for.  (Apr. 17, 2015 Tr. 373.)  In addition, a sailor on duty must muster with his duty section throughout the twenty-four hour period.  (Apr. 17, 2015 Tr. 373, 377.)  The two exits from the ship were guarded, and a sailor on duty could not leave the ship without permission.  (Apr. 17, 2015 Tr. 376–77.)  If Dick had missed a muster or attempted to slip off

40

the ship, Ziegler would have received a report. (Apr. 17, 2015 Tr. 377.)  Ziegler confidently and credibly testified that he received no such call. (Apr. 17, 2015 Tr. 376–77.)

After Williams' arrest, Ziegler overheard Dick expressing unease about some police questioning he had just experienced. (Apr. 17, 2015 Tr. 369.)  Dick thought he was on duty the night of July 7, 1997. (Apr. 16, 2015 Tr. 154.)  Because the ship had four-day rotating duty, Ziegler simply counted backwards and confirmed that Dick was on duty the night of July 7, 1997. (Apr. 17, 2015 Tr. 369.)

When Dick later left for questioning by the police and failed to return, Ziegler voiced to his chain of command, "I can imagine you could talk Joe into anything.  My guess is he has confessed to this damn thing.  And there is no way he could have been there." (Apr. 17, 2015 Tr. 383.)  After Dick had confessed to the rape and murder, Ziegler's superiors told him that it was a civilian matter now and that the ship's legal department would contact him if his assistance was required. (Apr. 17, 2015 Tr. 383.)  Ziegler testified that no one ever contacted him.[24] (Apr. 17, 2015 Tr. 383.)  Specifically, Ziegler insisted that he never spoke with Dick's attorney. (Apr. 17, 2015 Tr. 383.)  The first time anyone contacted him was in 2005, when an investigator for Dick contacted him. (Apr. 17, 2015 Tr. 384.)  Although certain that Dick was on duty the night of the murder, Ziegler never reached out to anyone outside of his chain of command to let them know Dick was on duty. (Apr. 17, 2015 Tr. 395–96.)

### (b) Robert Queary

Warrant Officer Robert Queary was assigned to the *USS Saipan* from 1997 to 2000. (Apr. 17, 2015 Tr. 579.)  Queary acknowledged that after Dick's arrest he received a letter from

---

[24] As reflected below, Michael Fasanaro contends that he contacted Zeigler.

41

an attorney and returned a phone call to that lawyer, but he does not "recall any further contact with that individual." (Apr. 17, 2015 Tr. 580–81.)

### (c) Fasanaro's Account of his Unsuccessful Attempt to Verify Dick's Alibi

Shortly after his arrest, Dick's family retained defense attorney Michael Fasanaro. (JSF ¶ 527.) During one of their initial meetings, Dick told Fasanaro that he thought that he might have been on the *USS Saipan* on the night of the murder. (Apr. 17, 2015 Tr. 406.) Fasanaro then wrote a letter to Warrant Officer Queary. (Joint Ex. 459, at 1.) Fasanaro asked Queary to contact him and to provide any information he had about whether "Dick stood on board the SAIPAN during the period of July 5–6–7, 1997." (Joint Ex. 459, at 1.) Fasanaro later called Queary, who had assembled Chief Gilcrest and First Class Petty Officer Ziegler on the other end of the call. (Apr. 17, 2015 Tr. 409–10.) Fasanaro learned they could not find the duty lists for July 5, 1997 through July 8, 1997. (Apr. 17, 2015 Tr. 410.)

Queary then told Fasanaro that they had found some stuff on a computer that was "[n]ot good." (Apr. 17, 2015 Tr. 411.) A letter on the computer "was written like a Forum Penthouse letter." (Apr. 17, 2015 Tr. 413.) The letter involved, "[t]aking a gun and kidnapping someone." (Apr. 17, 2015 Tr. 411.) Ziegler told Fasanaro that he did not believe Dick had committed the crimes until he saw that letter. (Apr. 17, 2015 411–12.) Chief Gilchrest concluded the call by stating "they could find no info concerning the July 4, through July 8" dates. (Apr. 17, 2015 Tr. 413.)

Fasanaro then told Dick "they couldn't find any evidence of his being on duty. " (Apr. 17, 2015 Tr. 414.) Ever compliant with anyone's suggestions, Dick responded that "he could have been mistaken as to the dates that he was on duty." (Apr. 17, 2015 Tr. 414.)

#### (d)  Evaluation of Dick's Alibi

Although his testimony does not match up with Fasanaros' recollection, Ziegler presented as a very persuasive and credible witness when he testified that Dick was on duty on the night the rape and murder occurred.  Given the foregoing information, a reasonable juror evaluating Dick's alibi could readily doubt whether Dick, despite his statements, was truly present or in any way participated in the crimes against Bosko.

### 3.  General Evaluation of Dick's Credibility

The problem with Dick's confessions is that he confesses too much.  As the police developed evidence, Dick changed his story to fit their evolving theory of the case.  As the police identified potential culprits, Dick added new characters to the story.  A police informant persuaded him to write an inculpatory letter to a woman Dick knew to be dead.  Dick's gullibility is apparently endless.  It is clear that Dick was a dupe for the police, whom they could manipulate to get any story they wanted.

Dick has provided a host of accounts of how the crimes occurred.  The inconsistencies between the accounts themselves and the physical evidence are legion.  (*See, e.g.*, JSF ¶¶ 531–97.)  As the United States Court of Appeals for the Fourth Circuit observed in Tice's habeas case, "in light of the variety of accounts Dick had provided and the lack of any significant corroboration of his testimony . . . , a reasonable jury would have grave doubts as to Dick's veracity . . . ." *Tice v. Johnson*, 647 F.3d 87, 109 (4th Cir. 2011) (internal quotation marks and citations omitted).  Moreover, this Court has had the opportunity to personally evaluate Dick's testimony.  That experience reinforces the conclusion that a reasonable juror would harbor

43

significant doubts as to any testimony by Dick whether offered in furtherance of his guilt or innocence or the guilt or innocence of any individual associated with the crimes against Bosko.

## VIII.   Final Analysis

Considering the evolution of their admissions, their subsequent recantations, and the other physical evidence, the admissions of guilt by Williams, Dick, Wilson, and Tice are far from convincing.[25]   Any reasonable juror considering all of the evidence would harbor reasonable doubt as to whether Williams, Dick, or anyone else, was with Ballard in Bosko's apartment. *See House v. Bell*, 547 U.S. 518, 553–54 (2006) (granting relief on gateway claim of innocence despite defendant's lie to police and other evidence that could "still support an inference of guilt").

Any juror would find it striking that only Ballard's DNA was found in Bosko's vagina and under Bosko's fingernail.  While the Commonwealth has proposed scenarios where both Williams and Dick could have participated in the rape and murder without leaving any DNA, those scenarios are at best doubtful.  A reasonable juror would find the pattern and depth of the stab wounds more consistent with an attack by a single assailant than with an attack by multiple assailants.  A reasonable juror would find the evidence of the crime scene, and the blood droplet evidence in particular, nearly impossible to reconcile with an attack by multiple assailants.  In sum, all of the physical evidence in this case would cause a reasonable juror to entertain doubts as to whether Dick or Williams participated in the rape and murder of Bosko.

---

[25] Detective Ford's involvement makes it easier for a reasonable juror to believe that the confessions of Williams and Dick were false.  Left to themselves, it appears that Williams and Dick could not accurately confess as to how the rape and murder occurred.  The record is replete with instances where Williams, and Dick in particular, altered their confessions to accommodate details fed to them by the police.

44

Furthermore, both Williams and Dick have produced evidence of an alibi. Williams' assertion that he was home in bed is corroborated both by Nicole's contemporaneous statement to the police and Williams' consistent, candid professions of innocence to counsel. Ziegler insists that Dick was on duty on the *USS Saipan* at the time of the rape and murder of Bosko. Given the physical evidence of the crime described above, a reasonable juror would find it easier to believe that Williams was home in bed and Dick was on his ship, than that they joined Ballard to go across the hall to rape and murder a friend. Considering all the evidence, no juror, acting reasonably, would vote to find Williams or Dick guilty beyond a reasonable doubt of the rape and murder of Bosko. As Williams and Dick have satisfied the standard for a gateway claim of actual innocence, the Court will proceed to examine the merit of their underlying constitutional claims.

A separate Order will follow discussing the procedure to be followed for addressing the merits of Williams' and Dick's claims.

Date: 9/26/16
Richmond, Virginia

/s/
John A. Gibney, Jr.
United States District Judge